**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave, Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-mail: swestcot@bursor.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

EDEN MCKIE, individually and on behalf of all others similarly situated,

Plaintiff,

v.

HUEL LTD.,

Defendant.

Case No. 3:26-cv-00653-CRB

**FIRST AMENDED CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Eden McKie ("Plaintiff") brings this action on behalf of herself, and all others similarly situated (the "Class Members"), against Defendant Huel Ltd. ("Defendant" or "Huel"). Plaintiff makes the following allegations pursuant to the investigation of her counsel based upon information and belief, except as to allegations specifically pertaining to herself, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all U.S. residents who accessed and navigated www.huel.com (the "Website") and whose electronic communications were intercepted or recorded by advertising technologies provided by Meta Platforms, Inc. ("Facebook" or "Meta"), TikTok Ltd. ("TikTok"), and Snap Inc. ("Snap" or "Snapchat").

2. Huel is an online retailer for "complete, convenient, affordable food . . . . simply delivered."[1] Huel has "sold over 400,000,000 meals to over 150 countries."[2]

3. Defendant Huel owns and operates the Website where consumers can browse and purchase various nutritional meals.

4. When consumers visit the Website, they are presented with the opportunity to opt out of third-party tracking technologies including those which Defendant uses for targeted advertising and website performance purposes. *See e.g. infra* Figs. 1–5.

5. Unbeknownst to its customers, and contrary to its express assurance that customers have control over the sale and sharing of their personal information, Defendant intercepts and discloses its customers personally identifiable information ("PII"), and product purchase information to unknown third parties—including, but not limited to, Meta, TikTok, and Snapchat (the "Third Parties")—even when customers affirmatively disable the tracking technologies.

6. Defendant aids, agrees with, employs, or otherwise enables Third Parties to eavesdrop on communications sent and received by Plaintiff and Class Members on the Website that Defendant owns and operates, including communications that contain personally identifiable information ("PII"). By failing to procure consent—and continuing to allow the Third Parties'

[1] LINKEDIN, *About Us*, https://uk.linkedin.com/company/huel.

[2] *Id.*

tracking even after consumers reject the tracking technologies—Defendant violated the Electronic Communications Privacy Act ("ECPA") (18 U.S.C. §2511, *et seq.*), the California Invasion of Privacy Act ("CIPA") § 631–32, and the Comprehensive Computer Data and Access and Fraud Act ("CDAFA") § 502.

## PARTIES

***Plaintiff***

7. Plaintiff Eden McKie is a resident and citizen of Fremont, California. At all relevant times, Plaintiff maintained active accounts with Facebook, TikTok, and Snapchat. When creating her accounts, Plaintiff provided the Third Parties with her PII, including her full name, date of birth, phone number, and email address. Plaintiff used the same device to access the Website that she did to access her Facebook, TikTok, and Snapchat accounts. Plaintiff was in California when she visited the Website.

8. Within the last 12 months, Plaintiff navigated to and accessed Defendant's Website—while in California—to purchase products from Defendant. For example, on or around June 11, 2025, Plaintiff navigated to Defendant's Website to purchase four hot & savory meal packs and seven hot & savory meal cups. Despite Defendant's representations of confidentiality, Plaintiff's communications during this visit were intercepted and disclosed to Third Parties through the tracking technologies, including communications that contained Plaintiff's identity and information about her purchases. Neither Defendant nor the Third Parties procured Plaintiff's consent prior to these interceptions, nor was Plaintiff on notice of the fact that such interceptions were occurring—in fact, Plaintiff expressly rejected such tracking. Such disclosures are a violation of Plaintiff's privacy and were done intentionally for targeted advertising purposes.

***Defendant***

9. Defendant Huel Ltd. is UK-based company, headquartered in Tring, Hertfordshire.

10. Defendant owns and operates the Website, through which consumers use to browse for various products, place orders, and receive deliveries. Defendant's Website is used by consumers' throughout the United States, including California.

11. Defendant's operation of a Website available to consumers throughout the U.S. including within the state of California, along with its distribution relationship with Huel Inc. show that Huel Ltd. intentionally serves and profits from the U.S. market, including California, by intentionally placing its products into channels of commerce for U.S., and more specifically, California consumers.

12. Defendant knowingly and intentionally incorporated a host of tracking technologies for marketing, advertising, and analytics purposes on the Website without disclosure to its users, including the tracking technologies provided by Third Parties.

13. Defendant configured the Tracking Technologies such that even if a customer rejected their use, several tracking technologies continued to intercept their identity and purchase information. Defendant chose to do so despite the privacy representations it made to consumers.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from Defendant.

15. Under *Briskin v. Shopify, Inc.*, 135 F.4th 739, 755–62 (9th Cir. 2025), where, during its regular course of business, a company is alleged to target California consumers to extract, collect, maintain, distribute, and exploit for its own profit, personally identifying information that it extracts from the software it permanently installs on their devices without their knowledge or consent, federal courts may exercise specific personal jurisdiction. This Court has personal jurisdiction over Defendant because it purposefully directs its business activities in this District by offering its products to residents of this District and performing services in this District. Further, Plaintiff was residing in this District when she accessed the Website and had the Tracking

Technologies installed on her device, which Defendant knew would cause harm throughout California, including within this District.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant does substantial business in this District, a substantial part of the events giving rise to the claim occurred in this District, and Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

### A. Defendant's Website and Privacy Representations

17. "[W]ebsite owners often manipulate their privacy settings to make it harder for consumers to protect their privacy."[3]

18. "Cookies allow the websites to track user information for profiling and targeted advertising. The cookie consent notices will typically ask for consent to data collection and state how the data will be used. In this decision-making setting, users often have incomplete information regarding the cookie settings, which puts them at a disadvantage when compared with web designers."[4]

19. Defendant owns and operates the Website. Unbeknownst to customers, Defendant integrates tracking codes from Meta, TikTok, and Snap into the Website (collectively the "Tracking Technologies").

20. Through its Website, Defendant promises customers that it will keep their personally identifiable electronic communications confidential. Critically, Defendant offers consumers an opportunity to reject/limit cookies by allowing them to edit their "Cookie Settings" or by selecting "Required cookies only" button. *See* Fig. 1. Unbeknownst to consumers, this

[3] Danyang Li, *The FTC and the CPRA's Regulation of Dark Patterns in Cookie Consent Notices*, 1 U. CHI. BUS. L. REV. 561 (2022) https://businesslawreview.uchicago.edu/print-archive/ftc-and-cpras-regulation-dark-patterns-cookie-consent-notices; Midas Nouwens et al., Dark Patterns After the GDPR: Scraping Consent Pop-Ups and Demonstrating Their Influence, PROC. 2020 CHI CONF. ON HUM. FACTORS COMPUTING SYS. 1–13 (2020).

[4] *Id.*

choice is illusory; Defendant shares sensitive details about its customers' identities and purchases even if the consumer rejects Defendant's cookie banner.




**Figure 1**

21. When a consumer interacts with this cookie banner, Defendant offers them the choice to disable non-required cookies (i.e., performance cookies, functional cookies, and targeting cookies). Fig. 2.




**Figure 2**

22. Further, Defendant explicitly warrants the tracking technologies it installed on the Website do not store its customers' personal information—Defendant makes this representation irrespective of whether a customer accepts or rejects cookies. For example, Defendant warrants (1) Strictly Necessary Cookies "do not store any personally identifiable information (Fig. 3), (2) the information collected by Performance Cookies "is aggregated and therefore anonymous" (Fig. 4) and (3) that Targeting Cookies do not store directly personal information (Fig. 6).




**Figure 3**




**Figure 4**




**Figure 5**




**Figure 6**

23. The Tracking Technologies discussed herein, commonly fall under the category of Targeting/Targeted Advertising Cookies.

24. Despite Defendant's assurances that none of the Tracking Technologies share personal information, (***Defendant makes this representation irrespective of whether a consumer accepts or rejects cookies***), Defendant enables third parties—including Meta, TikTok, and Snap—to that track consumers'—including Plaintiff's—Website browsing activities and eavesdrop on users' private communications on the Website.

25. As courts across the country have recognized, the identifiers that the Tracking Technologies capture—names, email address, phone number, and social media IDs—constitute "directly personal information." *See supra* Figs. 3–6. By capturing this information, contrary to its explicit representations not to, Defendant fails to receive consent from customers to intercept their communications.

26. Further, Defendant continues to track consumers even after they ***reject*** these tracking technologies.

27. Despite clear promises not to, Defendant transmits, and Third Parties intercept, sensitive information about Plaintiff's and Class Members' identity and purchases.

**B. Consumers Have A Financial Stake In Companies' Promises Relating To Their Data Privacy**

28. "In an era where every click, tap or keystroke leaves a digital trail, Americans remain uneasy and uncertain about their personal data and feel they have little control over how it's used."[5]

29. "The value of consumer data often comes from identifying users and combining their data from various sources. This is possible, in part, through the ubiquity of personally identifiable information (PII) and unique identifiers, as well as identifying individuals from non-PII, such as aggregated or anonymized data. The ability to identify users enables website and app

[5] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER (October 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/

operators to combine data and track user activity across devices."[6]

30. "Advertisers, as well as website and app operators, have incentives to improve their ad targeting by collecting detailed information about each user. Advertisers might expect more precise targeting to increase sales. Websites' revenue may depend on how frequently users click on the ad or how much time users spend viewing the ad."[7]

31. For retailers—like Defendant—the ability to compile consumer patterns into algorithms improves how precisely they can sell to those same consumers.[8]

32. With increased surveillance of consumers' purchase patterns, consumer concern over the control of their data privacy has continued to grow:

- "86% of Americans are more concerned about their privacy and data security than the state of the U.S. economy – but two-thirds either don't know or are misinformed about how their data is being used and who has access to their privacy"[9]
- "67% of respondents don't understand what data privacy means or how their data is being used"[10]
- The public increasingly says they don't understand what companies are doing with their data. Some 67% say they understand little to nothing about what companies are doing with their personal data, up from 59%[11]
- 72% of Americans say there should be more [government] regulation than there is now; just 7% say there should be less. [12]
- Roughly four-in-ten Americans say they are *very* worried about companies selling their information to others without them knowing (42%) or people stealing

[6] CLARE Y. CHO & LING ZHU, CONG. RSCH. SERV., R47298, *Online Consumer Data Collection and Data Privacy*, (October 31, 2022), https://www.congress.gov/crs-product/R47298.

[7] Clare Y. Cho, CONG. RSCH. SERV., IF11448, *How Consumer Data Affects Competition Through Digital Advertising*, (January 26, 2023), https://www.congress.gov/crs-product/IF11448.

[8] Charles Duhigg, *How Companies Learn Your Secrets*, N.Y. TIMES, Feb. 16, 2012, https://www.nytimes.com/2012/02/19/magazine/shopping-habits.html (example of how Target used consumer characteristics to identify and market to pregnant women).

[9] Gary Drenik, *Data Privacy Tops Concerns For Americans – Who Is Responsible For Better Data Protections?*, FORBES, (Dec. 8, 2023) https://www.forbes.com/sites/garydrenik/2023/12/08/data-privacy-tops-concerns-for-americans--who-is-responsible-for-better-data-protections/.

[10] *Id.*

[11] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER, (Oct. 18, 2023) https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/.

[12] *Id.*

their identity or personal information (38%).[13]

- 81% say they feel very or somewhat concerned with how companies use the data they collect about them. [14]
- People don't feel in control: Roughly three-quarters or more feel they have very little or no control over the data collected about them by companies (73%)[15]
- 36% strongly agree or somewhat agree they're in control of personal data. A third (29%) were concerned about how retailers and e-commerce companies use consumer data.[16]
- An overwhelming majority (85%) of consumers are taking at least one step to address their privacy and security concerns. However, 75% feel they should be doing more, and many indicate they feel a sense of powerlessness: They believe that companies can track them no matter what they do (26%), don't know what actions they can take (25%), and think hackers can access their data no matter what they do (21%).[17]

33. This concern over data privacy also impacts consumer purchase behavior:

- 79% of Americans are concerned about how companies use their data.[18]
- 75% of Americans believe there should be more regulations to protect their privacy from companies collecting consumer data without their consent or knowledge. [19]
- 60% of users say they would spend more money with a brand they trust to handle their personal data responsibly.[20]
- 52% of American users chose not to use a product or service due to worries about

---

[13] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *Views of data privacy risks, personal data and digital privacy laws*, PEW RESEARCH CENTER, (Oct. 18, 2023) https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/

[14] *Id.*

[15] *Id.*

[16] *Survey Shows Consumers Concerned About Personal Data, Privacy and Internet Safety for Children,* KINETIC, (Jan. 24, 2025) https://www.windstream.com/blog/consumer-data-privacy-survey-2025.

[17] *New Deloitte Survey: Increasing Consumer Privacy and Security Concerns in the Generative AI Era*, DELOITTE, (Dec. 2, 2024) https://www.deloitte.com/us/en/about/press-room/increasing-consumer-privacy-and-security-concerns-in-the-generative-ai-era.html.

[18] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019) https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[19] Branka Vuleta, *18 Chilling Privacy Statistics in 2023*, LEGALJOBS (Jul. 22, 2025) https://legaljobs.io/blog/privacy-statistics.

[20] *Global Consumer State of Mind Report 2021,* TRUATA, https://www.truata.com/resources/report/global-consumer-state-of-mind-report-2021/.

how much personal data would be collected about them.[21]

- 48% of users have stopped buying from a company over privacy concerns.[22]
- 33% of users have terminated relationships with companies over data. They left social media companies, ISPs, retailers, credit card providers, and banks or financial institutions.[23]
- 81% of users say the potential risks they face from companies collecting data outweigh the benefits[24]

34. Consumer concerns over their privacy have been addressed at both the state and federal levels by the California Legislature and the Federal Trade Commission.

**C. The Federal Trade Commission and California Legislature's Protection of Consumer Data**

35. The Federal Trade Commission has taken action "against dozens of companies that claimed to safeguard the privacy or security of users' information but didn't live up to their promises in the day-to-day operation of their business."[25]

36. Notably, the Federal Trade Commission seeks enforcement against companies who violate their representations about safeguarding consumer information:

> When companies tell consumers they will safeguard their personal information, the FTC can and does take law enforcement action to make sure that companies live up these promises. The FTC has brought legal actions against organizations that have violated consumers' privacy rights, or misled them by failing to maintain security for sensitive consumer information, or caused substantial consumer injury. In many of these cases, the FTC has charged the

---

[21] Andrew Perrin, *Half of Americans have decided not to use a product or service because of privacy concerns*, PEW RESEARCH CENTER, (Apr. 14, 2020) https://www.pewresearch.org/short-reads/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/.

[22] Ratnesh Pandey, *Staying Cyber-Secure While Working From Home*, TABLEAU, (updated Jul. 18, 2024) https://public.tableau.com/app/profile/ratnesh2928/viz/Stayingcyber-securewhileworkingfromhome/Stayingcyber-securewhileworkingfromhome/.

[23] *Consumer Privacy Survey*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-cybersecurity-series-2021-cps.pdf.

[24] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019) https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[25] *Marketing Your Mobile App: Get It Right from the Start,* FEDERAL TRADE COMMISSION, https://www.ftc.gov/business-guidance/resources/marketing-your-mobile-app-get-it-right-start.

> defendants with violating Section 5 of the FTC Act, which bars unfair and deceptive acts and practices in or affecting commerce. In addition to the FTC Act, the agency also enforces other federal laws relating to consumers' privacy and security.[26]

37. At the state level, the California Legislature is at the forefront of protecting citizens' privacy. Take, for example, the California Online Privacy Protection Act, requiring companies to "conspicuously post [their] privacy policy" and "[d]isclose whether other parties may collect personally identifiable about an individual consumer's online activities over time and across different Web sites when a consumer uses the operator's Web site or service."[27] This statute also defines "personally identifiable information ("PII")" as "[a] first and last name," "[a] home or other physical address," "[a]n e-mail address," "[a] telephone number," and "[a]ny other identifier that permits the physical or online contacting of a specific individual."[28]

### D. Overview of the California Invasion of Privacy Act and the Federal Wiretap Act

38. The California Legislature enacted CIPA to protect certain privacy rights of California citizens. The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

39. The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

40. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

---

[26] *Privacy and Security* Enforcement, FEDERAL TRADE COMMISSION, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement.

[27] Cal. Bus. & Prof. Code § 22575(a).

[28] Cal. Bus. & Prof. Code § 22575(a).

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

41. As part of CIPA, the California Legislature introduced § 631(a), which imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978). Specifically, CIPA § 631(a) prohibits any person or entity from:

> (i) "intentionally tap[ping], or mak[ing] any unauthorized connection . . . with any telegraph or telephone wire";
>
> (ii) "willfully and without the consent of all parties to the communication . . . read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or
>
> (iii) "us[ing], or attempt[ing] to use . . . any information so obtained."

42. CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

43. Individuals may bring an action against a violator of CIPA § 631 for $5,000 per violation. Cal. Penal Code § 637.3.

44. In a manner similar to CIPA, the Federal Wiretap Act (i.e. the ECPA) creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."[29]

45. Although the ECPA does not apply "where one parties to the communication has given consent[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "the purpose of committing any criminal or tortious act in violation of the Constitution or laws

---

[29] *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).

of the United States or of any State."[30]

**E. Function of Tracking Technologies**

46. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

47. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

48. Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- <u>HTTP Request</u>: an electronic communication sent from a device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- <u>Cookies</u>: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- <u>HTTP Response</u>: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

49. A consumers' HTTP Request essentially asks the website to retrieve certain information (such as payment submissions and user selections), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

50. Every website is comprised of Markup and "Source Code." Source Code is a set of

---

[30] 18 U.S.C. § 2511(d)

instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

51. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The Meta, TikTok, and Snap tracking codes embedded on the Website by Defendant constitute Source Code.

**F. Meta's Tracking Technology**

52. Meta is one of the largest advertising companies in the country. To date, Meta generates nearly 98% of its revenue through advertising, [31] bringing in an excess of $160 billion in 2024.[32]

53. Meta's advertising business began back in 2007 with the creation of "Facebook Ads," which was marketed as a "completely new way of advertising online" that would allow "advertisers to deliver more tailored and relevant ads." [33]

54. Today, Meta provides advertising on its own platforms, such as Facebook and Instagram, as well as websites outside these apps through the Facebook Audience Network. Facebook alone has more than 3 billion active users. [34]

55. Meta's advertising business has been extremely successful due, in large part, to Meta's ability to target people at a granular level. "Among many possible target audiences, [Meta] offers advertisers," for example, "1.5 million people 'whose activity on Facebook suggests that

---

[31] Emmanuel Oyedegi, *Meta's ad business generated 98% of its total revenue in Q2 2025*, TECHLOY (Jul. 31, 2025) https://www.techloy.com/metas-ad-business-generated-98-percent-of-its-total-revenue-in-q2-2025/.

[32] Stacy Jo Dixon, *Meta's ad business generated 98% of its total revenue in Q2 2025*, STATISTA (Jan. 30, 2025) https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/?srsltid=AfmBOopC65RAw3WSm3y4ZtdYBpTiXhsmiFK7kSnFcm14WOV7esTu_uQ_https://www.statista.com/statistics/271258/facebooks-advertising-revenue-worldwide/?srsltid=AfmBOopC65RAw3WSm3y4ZtdYBpTiXhsmiFK7kSnFcm14WOV7esTu_uQ_

[33] Cecile Ho, *Announcing Facebook Pixel*, META (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

[34] Naveen Kumar, *Facebook Users Statistics (2025) – Latest Worldwide Data*, DEMANDSAGE (Aug. 19, 2015) https://www.demandsage.com/facebook-statistics/.

they're more likely to engage with/distribute liberal political content' and nearly seven million Facebook users who 'prefer high-value goods in Mexico.'" [35]

56. Given the highly specific data used to target specific users, it is no surprise that millions of companies and individuals utilize Meta's advertising services. Meta generates substantially all of its revenue from selling advertisement placements:[36]

**Table 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $117.93 billion | $114.93 billion | 97.46% |
| 2020 | $85.97 billion | $84.17 billion | 97.90% |
| 2019 | $70.70 billion | $69.66 billion | 98.52% |
| 2018 | $55.84 billion | $55.01 billion | 98.51% |

57. One of Meta's most powerful advertising tools is the Meta Pixel, formerly known as the Facebook Pixel, which launched in 2015 and its SDK.

58. Meta touted the Meta Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." According to Meta, to use Meta Pixel an advertiser need only "place a single pixel across [its] entire website to report and optimize for conversions" so that the advertiser could "measure the effectiveness of [its] advertising by understanding the action people take on [its] website."[37]

59. The Meta Pixel is a snippet of code embedded on a third-party website that tracks users' activity as the users navigate through a website. As soon as a user takes any action on a webpage that includes the Meta Pixel, the code embedded in the page re-directs the content of the user's communication to Meta while the exchange of the communication between the user and website provider is still occurring.

60. Through this technology, Meta intercepts each page a user visits, what buttons they

[35] Natasha Singer, *What You Don't Know About Facebook Uses Your Data*, NEW YORK TIMES (Apr. 11, 2018) https://www.nytimes.com/2018/04/11/technology/facebook-privacy-hearings.html.

[36] *Facebook Ad Revenue (2017–2027),* OBERLO, https://www.oberlo.com/statistics/facebook-ad-revenue.

[37] Cecile Ho, *Announcing Facebook Pixel*, META (Oct. 14, 2015) https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/.

click, as well as specific information they input into the website and what they searched. The Meta Pixel sends each of these pieces of information to Meta with other identifiable information, such as the user's IP address. Meta stores this data on its own server, in some instances, for years on end.

61. This data is often associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits Defendant's Website, Meta receives third-party cookies allowing Meta to link the data collected by Meta Pixel to the specific Facebook user.

62. For example, Meta uses cookies named c_user, datr, fr and fbp to identify its account holders. Meta stores or updates Meta-specific cookies every time a person accesses their Facebook account from the same web browser.

63. The Meta Pixel can access these cookies and send certain identifying information like the user's Facebook ID to Facebook along with the other data relating to the user's website inputs.

64. The c_user cookie value is the Facebook equivalent of a user identification number. Each Facebook user account has one—and only one—unique c_user cookie. Facebook uses the c_user cookie to record user activities and communications.

65. A User's Facebook ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the User, including pictures, personal interests, work history, relationship status, and other details. Because the User's Facebook Profile ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the User's corresponding Facebook profile. To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID.

66. The Facebook datr cookie identifies the User's web browser. It is an identifier unique to each person's specific web browser and is another way Facebook can identify Facebook users.

67. The Facebook fr cookie is a combination of the Facebook ID (c_user) and the browser ID (datr) cookie values.

68. A User who accessed Defendant's Website while logged into (or recently having logged into) Facebook would have their browser transmit the c_user, datr and fr cookies to Facebook.

69. At each stage, Defendant also utilized the _fbp cookie, which attaches to a browser as a first-party cookie, and which Facebook uses to identify a browser and a user.

70. Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, Facebook ID, User-IDs, cookie identifiers, device identifiers, emails, and phone numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click and view related to the shopping and products sought from Defendant).

71. Meta can also link the data to a specific user through the "Facebook Cookie." The Facebook Cookie is a workaround to recent cookie-blocking techniques, including one developed by Apple, Inc., to track users, including Facebook users.

72. Lastly, Meta can link user data to individual users through identifying information collected through Meta Pixel using what Meta calls "Advanced Matching." There are two forms of Advanced Matching: manual matching and automatic matching. Using Manual Advanced Matching the website developer manually sends data to Meta to link users. Using Automatic Advanced Matching, the Meta Pixel scours the data it receives to search for recognizable fields, including name and email address to match users to their Facebook accounts.[38]

73. Importantly, even if Meta Pixel collects data about a non-Facebook user, Meta still retains and uses the data collected through Meta Pixel in its analytics and advertising services. These non-users are referred to as having "shadow profiles" with Meta.[39]

74. At the time Plaintiff used Defendant's Website, she maintained an active social media account on Facebook. Plaintiff accessed the Defendant's Website from the same device she used to visit Facebook, and Meta associated the data it collected about her from Defendant's

[38] While Meta purports to "hash" the PII provided by customers, Meta actually uses the hashed format *specifically to link the Meta Pixel data to Facebook profiles*.

[39] Jürgen Graf, *Investigating shadow profiles: The data of others*, TECHXPLORE (Sept. 22, 2023) https://techxplore.com/news/2023-09-shadow-profiles.html.

Website with her Facebook account and other PII. Meta was also able to associate this information with her identity by matching hashed identifiers (name, phone, email, and address) to its own records.

75. Meta offers an analogous mobile version of the Meta Pixel known as an SDK to app developers. Meta's SDK allows app developers "to track events, such as a person installing your app or completing a purchase." By tracking these events developers can measure ad performance and build audiences for ad targeting.[40]

76. Meta's SDK collects three types of App Events. Automatically Logged Events are "log[] app installs, app sessions, and in-app purchases." Standard Events are "popular events that Facebook has created for the app." Custom Events are "events [the app developers] create that are specific to [the] app."[41]

77. Once the data intercepted through the Meta Pixel or SDK is processed, Meta makes this data available through its Events Manager and Ads Manager pages, along with tools and analytics to reach these individuals through future Facebook ads. For instance, this data can be used to create "custom audiences" to target the user, as well as other Facebook users who match members of the audiences' criteria.[42]

78. In addition to using the data intercepted through Meta Pixel and SDK to provide analytics services, Meta uses this data to improve its personalized content delivery, advertising network, and machine-learning algorithms, including by improving its ability to identify and target users.

79. Meta has no way to limit or prohibit the use of data collected through Meta Pixel and its SDK given Meta's open systems and advanced algorithms.

80. According to leaked internal Meta documents, one employee explained "You pour that ink [i.e., data] into a lake of water . . . at it flows . . . everywhere . . . How do you put that ink

---

[40] *Meta App Event Tracking*, META, https://developers.facebook.com/docs/app-events/.

[41] *Meta App Event Tracking: Overview*, META, https://developers.facebook.com/docs/app-events/.https://developers.facebook.com/docs/app-events/overview.

[42] *Audience Network*, META, https://developers.facebook.com/docs/app-events/overview.https://developers.facebook.com/docs/audience-network/.

back in the bottle? How do you organize it again, such that it only flows to the allowed places in the lake?”[43]

81. In these same leaked documents, another employee explained Meta does “not have an adequate level of control and explainability over how our systems use data, and thus we can’t confidently make controlled policy changes or external commitments such as ‘we will not use X data for Y purpose.’ And yet, that is exactly what regulators expect us to do, increasing our risk of mistakes and misrepresentation.”[44] Thus, once the data enters the Meta system, either through its SDK or Pixel, the data can be used for any and all purposes.

82. Meta’s own employees confirmed no one at Meta can state confidently where all the data about a user is stored and used. In a recent court hearing as part of the Cambridge Analytica scandal of 2018, Meta’s own engineers testified there was not a “single person” at Meta who could answer that question. [45]

83. Defendant uses at least the Meta Pixel on its Website. As a result, Defendant disclosed and Meta intercepted users’—including Plaintiff’s—interactions on the Website. Meta received at least the customer’s name, email, location, and purchase information which it could associate with embedded cookies to further associate the information with the customer’s profile. Meta and Defendant used this data, as well as other data uploaded directly to Meta by Defendant, so that Defendant could run advertisements using its services.

84. Plaintiff did not consent to the interception or disclosure of her data to Meta. Defendant’s disclosure, and Meta’s interception, of Plaintiff’s and prospective class members’ PII without their consent is an invasion of privacy and violates several laws, including the ECPA (18

---

[43] Lorenzo Franceschi-Bicchierai, *Facebook Doesn’t Know What It Does With Your Data, Or Where It Goes: Leaked Document*, VICE, (Apr. 26, 2022) https://www.vice.com/en/article/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes/.

[44] *Id.*

[45] Isober Asher Hamilton, *Senior Facebook engineers say no one at the company knows where your data is kept*, BUSINESS INSIDER, (Sept. 8. 2022) https://www.businessinsider.com/meta-doesnt-know-where-all-your-data-is-engineers-say-2022-9#:~:text=Two%20Meta%20engineers%20were%20grilled,there%20for%20almost%20nine%20years.

U.S.C. §2511, *et seq.*), CIPA §631, CIPA §632, the CDAFA (Cal. Penal Code § 502), and the California State Constitution.

**G. TikTok's Tracking Technology**

85. TikTok offers an SaaS called the TikTok Pixel, which helps businesses track the performance of their ads by sending information from the business's website to TikTok, who then uses that information to optimize ad campaigns on TikTok and across the internet.[46]

86. The TikTok pixel can be "plugged in" to any website, as the pixel is a piece of code that can be added to any website to capture "events" (any activity by a user that happens on a website).

87. The TikTok Pixel is part of a package of prebuilt software tools under the "TikTok for Business" product line that allow the delivery of personalized ads. By employing TikTok to collect user information through the TikTok Pixel, websites that procure TikTok's services can use the information to deliver more effective targeted advertisements, increasing revenue for the websites.

88. In short, when users interact with a webpage with the TikTok Pixel installed, the TikTok Pixel collects the "Metadata and button clicks" (information about what the user clicked on—such as the specific URL address visited by the user— or text entered into the webpage), a timestamp for the event, and the visitor's IP address.[47] That information is sent automatically to TikTok.

89. The "TikTok for Business" business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the TikTok Pixel.

---

[46] "TikTok Pixel 101: What It Is & How to Use It," https://popupsmart.com/blog/tiktok-pixel (Last accessed December 27, 2023).

[47] *About TikTok Pixel*, TIKTOK BUSINESS HELP CENTER (Mar. 2025) https://ads.tiktok.com/help/article/tiktok-pixel?redirected=2).

90. Thus, through websites that employ TikTok's services, TikTok directly receives the electronic communications of website visitors entered into search bars, chat boxes, and online quizzes in real time.

91. On each page on Defendant's Website that a user visits (where the TikTok Pixel is installed), TikTok collects the URL value of the page visited, an identification code TikTok uses to track the user, and the visitor's browser type and operating system.

92. When the TikTok Pixel is used on a website, it is not like a tape recorder or a "tool" used by one party to record the other. Instead, the TikTok Pixel involves TikTok, a separate and distinct third-party entity from the parties in the conversation, using the TikTok Pixel to eavesdrop on, record, extract information from, and analyze a conversation to which it is not a party. This is so because TikTok itself is collecting the content of any conversation. That information is then analyzed by TikTok before being provided to any entity that was a party to the conversation (like Defendant).

93. Once TikTok intercepts website communications, it has the capability to use such information for its own purposes. TikTok's Commercial Terms of Service grant TikTok "a non-exclusive, royalty-free, worldwide, transferable, sublicensable license to access, use, host, cache, store, display, publish, distribute, modify and adapt [information collected from partner websites] in order to develop, research, provide, promote, and improve TikTok's products and services."[48]

94. In practice, this means the information collected is used to (i) analyze trends in consumer behavior based on data collected from websites across the internet that TikTok can then use when providing targeted advertising to other companies, (ii) create consumer profiles of specific users, allowing TikTok to sell future customers targeted advertising to consumers with specific profile characteristics, and (iii) develop new TikTok Business products and services, or improve pre-existing TikTok Business products and services.

---

[48] *TikTok For Business Commercial Terms Of Service*, TIKTOK FOR BUSINESS, https://ads.tiktok.com/i18n/official/ policy/commercial-terms-of-service (Last updated March 2025).

95. One of TikTok's partners is Huel. The TikTok Pixel is employed on the Website in the manner described throughout this Complaint.

96. Plaintiff did not consent to the interception or disclosure of her data to TikTok. Defendant's disclosure, and TikTok's interception, of Plaintiff's and prospective class members' PII without their consent is an invasion of privacy and violates several laws, including the ECPA (18 U.S.C. §2511, *et seq.*), CIPA §631, CIPA §632, the CDAFA (Cal. Penal Code § 502), and the California State Constitution.

**H. Snapchat's Tracking Technology**

97. Snapchat is a social media and messaging application that "offers a range of APIs through its Snap Kit, Lens Studio, and Marketing API, allowing developers to integrate Snapchat's features into their own applications."[49] Snapchat's Marketing API "is used for creating, managing, and optimizing advertising campaigns on Snapchat, including for targeting, budding, and tracking ad performance."[50]

98. Specifically, the Snapchat Marketing tool "provides a programmable interface to interact with Snapchat's advertising tools. This API enables automated creation and management of ad campaigns, audience targeting, and performance analytics, which can be a boom for marketers seeking to streamline their Snapchat advertising workflows."[51]

99. Snapchat offers a software service called "Snap Pixel," which "helps advertisers measure results, optimize targeting, and build audiences for their ad campaigns."[52] The Snap Pixel is part of a line of prebuilt software tools under the "Business" product line that allow the delivery of personalized ads by collecting user data through the Snap Pixel, which is used to deliver more effective targeted advertisements, increasing revenue for the websites that install the Pixel.

100. The Snap Pixel can be plugged into any website, as the pixel is "a piece of

[49] Charu Mitra Dubey, *Snapchat API: Developer Guide on How to Integrate Snapchat API*, PHYLLO (July 10, 2024), https://www.getphyllo.com/post/snapchat-api-guide.

[50] *Id.*

[51] *Snapchat Marketing API Integrations*, PIPEDREAM, https://pipedream.com/apps/snapchat-marketing.

[52] *Power Performance with the Snap Pixel*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel.

JavaScript code that's either installed on [a] website or integrated with an e-commerce store."[53]

101. When users interact with a webpage with the Snap Pixel installed, the Snap Pixel "tracks a variety of actions on [a] website, such as page views, add-to-cart actions, purchases, and sing-ups," as well as other "events," such as answering a quiz on a website.[54] The information is sent automatically to Snapchat.

102. The Snapchat Pixel "may send . . . (hashed) email addresses, (hashed) phone numbers and/or device identifiers, IP addresses, cookie IDs, metadata, and browser/app information" to Snap.[55] The information sent via is also accompanied with the sc_at cookie. Snapchat indicates that the sc_at cookie is "[u]sed to identify a visitor across multiple domains."[56]

103. The Snapchat advertising business model involves entering into voluntary partnerships with various companies and surveilling communications on their partners' websites with the Snap Pixel.

104. One of Snapchat's partners is Huel.

105. Thus, through websites that install the Snap Pixel, Snapchat directly receives the electronic communications of website visitors entered into search bars, chat boxes, and online quizzes in real time.

106. When the Snap Pixel is used on an entry to a website, it is not like a tape recorder, or a "tool" used by one party to record the other. Instead, the Snap Pixel involves Snapchat, a separate and distinct third-party entity from the parties in the conversation. That data is then analyzed by Snapchat before being provided to any entity that was a party to the conversation, like Defendant.

107. The purpose of such transmissions is so companies, like Defendant, can better advertise and target consumers on Snap's social media platform by enabling Snap to learn who visits the companies' websites. This also benefits Snap, as it allows Snap to monetize its Snapchat

[53] *Id.*

[54] *Id.*

[55] *Id.*

[56] *Cookie Information*, SNAPCHAT, https://www.snap.com/privacy/cooke-information.

social media platform through advertising revenue, and the better at targeting Snap is, the more companies, like Defendant, will pay to advertise on Snapchat.

108. Indeed, Snap provides various forms of targeted advertising based on the information it collects, including location and demographic targeting, e-mail based targeting, or targeting based on those similar to companies' "customer list or Pixel Custom Audience."[57] And, Snap will actually tell website operators like Defendant "how well your pixel setup matches events to Snapchat Accounts," enabling companies, like Defendant, to send further identifying information to Snap so it can better match website users to Snapchat accounts.[58]




**Figure 7**

109. Plaintiff did not consent to the interception or disclosure of her data to Snap. Defendant's disclosure, and Snap's interception, of Plaintiff's and prospective class members' PII without their consent is an invasion of privacy and violates several laws, including the ECPA (18 U.S.C. §2511, *et seq.*), CIPA §631, CIPA §632, the CDAFA (Cal. Penal Code § 502), and the California State Constitution.

**I. Defendant's Use of the Tracking Technologies**

110. Pursuant to agreements with Third Parties (Meta, TikTok, and Snap) Defendant intentionally and voluntarily embedded the Tracking Technologies on the Website. As illustrated within this section, Defendant unlawfully disclosed personally identifiable information to Third Parties through Tracking Technologies, without customer consent—***and more egregiously, even***

[57] *Meet Your Audience*, SNAPCHAT BUSINESS, https://forbusiness.snapchat.com/advertising/targeting.

[58] *Snap Pixel: Power Your Ad Performance*, SNAPCHAT, https://forbusiness.snapchat.com/advertising/snap-pixel.

***when customers reject such tracking.***

111. The Tracking Technologies are Source Code that do just that—they surreptitiously transmit a Website User's communications and inputs to the corresponding user IDs, much like a traditional wiretap.

112. For example, when individuals visit Defendant's Website via an HTTP request to Defendant's server, Defendant's server sends an HTTP response (including the Markup) that displays the webpage visible to the User, along with Source Code (including the Tracking Technologies).

113. Thus, Defendant is, in essence, handing its customers a tapped website and, once a webpage is loaded into the consumer's browser, the software-based wiretaps are quietly waiting for private communications on the webpage to trigger the Tracking Technologies, which then intercept those communications—intended only for Defendant—and instantaneously transmit those communications to Meta, TikTok, Snap, or other third parties.

114. Third parties—including Meta, TikTok, and Snap—offer companies, including Defendant, snippets of code they can install in web browsers of users accessing their services. These code snippets uniquely identify the user and are sent with each intercepted communication to ensure the third party can identify the specific user associated with the information intercepted (in this case, confidential PII and purchase information).

115. Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, Facebook ID, User-IDs, cookie identifiers, device identifiers, emails, and phone numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click, and view related to the shopping and products sought from Defendant).

116. Defendant installs these Tracking Technologies despite its understanding that its customers reasonably anticipate their identifiable information to be kept confidential and undisclosed to Third Parties. This installation contradicts Defendants promise to keep PII confidential. *See supra*–Figs. 3–6 Contrary to its promise, as soon as consumers enter Defendant's Website, Defendant begins tracking and disclosing their interactions with the Website to the Third

Parties.

117. More egregiously, Defendant continues to intercept and disclose customer information ***even after they reject cookies***.

118. When users access the Website, Defendant discloses the URLs and page titles of every page that they visit, including during the checkout process. The URLs and page titles disclose what type of product the user is seeking to purchase. For example, when a consumer clicks on a product, the URL of the page for that product, which includes information about the product is shared, is shared with Third Parties as enabled by Defendant. The Third Parties also receive information when the consumer adds the product to their cart before checkout.

119. Defendant also discloses confidential details about the purchase and personal information about the user to Third Parties in various forms throughout the checkout process.

120. Take, for example, Meta's tracking technologies. On the checkout page, Plaintiff and other users of Defendant's Website are prompted to enter their email address, phone number, name, and address. When a user completes the checkout process, Meta receives the user's email in a hashed format. Meta receives an abundance of consumer information, including hashed email (i.e., PII), payment event details, and item details, which it associates with various identifiers, even when the purchaser rejects all cookies. *See* Figs. 8–9.

121. Amongst the tracking technologies Defendant enabled on its Website are various cookies offered by Meta including the sb, datr, c_user, xs, and fr cookies. *See e.g.*, Fig. 9. The c_user cookie, which it associates with these events, is the equivalent of a user identification number unique to each Facebook user. Meta receives these cookies and events even when a customer rejects cookies.

122. When a consumer visits the Website for the first time, and creates an account, Defendant also discloses consumers' name (audff[fn/ln] and udff[fn/ln] values), phone (audff[ph] and udff[ph] values), email (audff[em] and udff[em] values), zip code (audff[zp] and udff[zp] values), city(audff[ct] and udff[ct] values) and state (audff[st] and udff[st] values).

123. At a minimum, on every subsequent visit Defendant discloses to Meta the customer's hashed email address (audff[em] and udff[em] values).

| | |
|---|---|
| id | 1573652859380772 |
| ev | AddToCart |
| dl | https%3A%2F%2Fhuel.com%2Fproducts%2Fhuel-black-edition |
| rl | https%3A%2F%2Fcheckout.huel.com%2F |
| if | false |
| ts | 1767996467817 |
| cd[currency] | USD |
| cd[value] | 56.3 |
| cd[content_ids] | %5B%22US-BLK-CPB-11%22%5D |
| cd[content_type] | product |
| sw | 1440 |
| sh | 2560 |
| v | 2.9.248 |
| r | stable |
| ec | 13 |
| o | 12318 |
| fbp | fb.1.1767887737460.729990130163300329 |
| eid | ob3_plugin-set_d2aa562fac08c7ee1bc97673de141b3932190bffd308178e0e45e9cc82913fba |
| ler | other |
| cdl | API_unavailable |
| pmd[description] | Experience%20Huel%20Black%20Edition%20%E2%80%93%2040g%20of%20plant%20protein%20and%2027%20essential%20vitamins%20and%20minerals.%20The%20ultimate%20low-carb%20meal%20replacement. |
| pmd[contents] | %5B%7B%22ids%22%3A%5B%22US-BLKS16-MX1-01%22%2C%22US-BLK10-BNDL%22%2C%22US-BLK-CPB-11%22%2C%22US-BLK-CH-11%22%2C%22US-BLK-BN-11%22%2C%22US-BLK-VA-11%22%2C%22US-BLK-SSC-11%22%2C%22US-BLK-CC-11%22%2C%22US-BLK-SC-11%22%2C%22US-BLK-CCR-11%22%2C%22US-BLK-CIN-11%22%2C%22US-BLK-UU-11%22%5D%2C%22name%22%3A%22Black%20Edition%20Unflavoured%20%26%20Unsweetened%22%7D%5D |
| plt | 1870.8999999761581 |
| it | 1767996447170 |
| coo | false |
| ap[currency] | USD |
| ap[contents] | %5B%7B%22item_price%22%3A75%2C%22availability%22%3A%22InStock%22%2C%22id%22%3A%22US-BLKS16-MX1-01%22%7D%2C%7B%22item_price%22%3A118.75%2C%22availability%22%3A%22InStock%22%2C%22id%22%3A%22US-BLK10-BNDL%22%7D%2C%7B%22item_price%22%3A56.3%2C%22availability%22%3A%22InStock%22%2C%22id%22%3A%22US-BLK-CPB-11%22%7D%2C%7B%22item_price%22%3A56.3%2C%22availability%22%3A%22InStock%22%2C%22id%22%3A%22US-BLK-CH-11%22%7D%2C%7B%22item_price%22%3A56.3%2C%22availability%22%3A%22InStock%22%2C%22id%22%3A%22US-BLK-BN-11%22%7D%2C%7B%22item_price%22%3A56.3%2C%22availability%22%3A%22InStock%22%2C%22id%22%3A%22US-BLK-VA-11%22%7D%2C%7B%22item_price%22%3A56.3%2C%22availability%22%3A%22InStock%22%2C%22id%22%3A%22US-BLK-SSC-11%22%7D%2C%7B%22item_price%22%3A56.3%2C%22availability%22%3A%22InStock%22%2C%22id%22%3A%22US-BLK-CC-11%22%7D%2C%7B%22item_price%22%3A56.3%2C%22availability%22%3A%22InStock%22%2C%22id%22%3A%22US-BLK-SC-11%22%7D%2C%7B%22item_price%22%3A56.3%2C%22availability%22%3A%22InStock%22%2C%22id%22%3A%22US-BLK-CCR-11%22%7D%2C%7B%22item_price%22%3A56.3%2C%22availability%22%3A%22InStock%22%2C%22id%22%3A%22US-BLK-CIN-11%22%7D%2C%7B%22item_price%22%3A56.3%2C%22availability%22%3A%22InStock%22%2C%22id%22%3A%22US-BLK-UU-11%22%7D%5D |

**Figure 8 (Meta)**

| | |
|---|---|
| id | 1573652859380772 |
| ev | SubscribedButtonClick |
| dl | https%3A%2F%2Fhuel.com%2Flogin |
| rl | |
| if | false |
| ts | 1767996363296 |
| cd[buttonFeatures] | %7B%22classList%22%3A%22button_Button__W4LUl%20button_Button--is-primary__LN_pz%20button_Button--is-extra-large__OelBk%22%2C%22destination%22%3A%22https%3A%2F%2Fhuel.com%2Flogin%22%2C%22id%22%3A%22%22%2C%22imageUrl%22%3A%22%22%2C%22innerText%22%3A%22Continue%22%2C%22numChildButtons%22%3A0%2C%22tag%22%3A%22button%22%2C%22type%22%3A%22submit%22%2C%22name%22%3A%22%22%2C%22value%22%3A%22%22%7D |
| cd[buttonText] | Continue |
| cd[formFeatures] | %5B%7B%22id%22%3A%22_r_3_%22%2C%22name%22%3A%22email%22%2C%22tag%22%3A%22input%22%2C%22placeholder%22%3A%22Email%20address%22%2C%22inputType%22%3A%22email%22%7D%5D |
| cd[pageFeatures] | %7B%22title%22%3A%22Huel%20US%22%7D |
| sw | 1440 |
| sh | 2560 |
| cudff[em] | %5E***********%23%23%23%23%23%40*****.*** |
| ncudff[em] | ************%23%23%23%23%23%40*****.*** |
| udff[em] | 418c50423bf8e8660509fa7eb50e24886a60d035ffea3f7e120816f4f2c3b0d0 |
| audff[em] | 418c50423bf8e8660509fa7eb50e24886a60d035ffea3f7e120816f4f2c3b0d0 |
| v | 2.9.248 |
| r | stable |
| ec | 5 |
| o | 14366 |
| fbp | fb.1.1767887737460.729990130163300329 |
| eid | ob3_plugin-set_122fb6e79f8cabf7a3b678c3aecbe5dc37ebf123f15811dcf02208630a5ff5a9 |
| ler | empty |
| cdl | API_unavailable |
| pmd[description] | Huel%20is%20nutritionally%20complete%20food%2C%20providing%20you%20with%20all%2026%20essential%20vitamins%20and%20minerals%2C%20protein%2C%20essential%20fats%2C%20carbs%2C%20fibre%20and%20phytonutrients. |
| plt | 5023 |
| it | 1767996359587 |
| coo | false |
| es | automatic |
| tm | 3 |
| expv2[0] | pl0 |
| expv2[1] | el3 |
| expv2[2] | bc1 |
| expv2[3] | mr2 |
| expv2[4] | ct2 |
| expv2[5] | hf3 |
| rqm | FGET |

**Figure 9 (Meta)**

124. Similarly, Defendant discloses, and TikTok intercepts hashed email and product details as consumers—including Plaintiff—navigate the checkout process. Fig. 10.

POST https://analytics.tiktok.com/api/v2/pixel → 200

Overview Request Response Summary Chart Notes


```
{
    "event": "AddToCart",
    "event_id": "37be95be-e3df-4b85-a7d4-790ab5e7af44",
    "message_id": "messageId-1767996467895-9000916066974-C33GTI7G09F7S5THL690",
    "is_onsite": false,
    "timestamp": "2026-01-09T22:07:47.895Z",
    "context": {
        "ad": {
            "sdk_env": "external",
            "jsb_status": 2
        },
        "device": {
            "platform": "pc"
        },
        "user": {
            "anonymous_id": "01KEF5365BYPFWAD9Q4MYVJS2Z_.tt.1",
            "email": "418c50423bf8e8660509fa7eb50e24886a60d035ffea3f7e120816f4f2c3b0d0",
            "external_id": "7910472188015"
        },
        "pixel": {
            "code": "C33GTI7G09F7S5THL690",
            "runtime": "1"
        },
        "page": {
            "url": "https://huel.com/products/huel-black-edition",
            "referrer": "https://huel.com/collections/weight-loss",
            "load_progress": "2"
        },
        "library": {
            "name": "pixel.js",
            "version": "2.2.1"
        },
        "session_id": "2fc4aa46-eda7-11f0-be26-b83fd2cda8ce::900vgGGOoEqrAoOqGLcV-C33GTI7G09F7S5THL690",
        "pageview_id": "2fc4aa46-eda7-11f0-be26-b83fd2cda8ce-H3h25.1.3::6dec4e87-eda7-11f0-b013-b83fd2f6220e-C33GTI7G09F7S5THL690",
        "variation_id": "traffic_1::default",
        "csid": "1767996276895::NvZwpxkm9xdE1Xgz0-6o",
        "page_csid": "1767996276895::yw3nooVCc58SsFYQpJTm",
        "csct": 2,
        "userAgent": "Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/143.0.0.0 Safari/537.36"
    },
    "_inspection": {
        "identity_params": {
            "email_is_hashed": ["plain_email", "plain_mdn_email"],
            "sha256_email": ["empty_value"],
            "phone_is_hashed": ["empty_value"],
            "sha256_phone": ["empty_value"],
            "zip_code": ["empty_value"]
        },
        "vids": "74539884,74813232"
    },
    "properties": {
        "gtm_version": "0_1_23:1013",
        "contents": [{
            "content_id": "US-BLK-CPB-11",
            "content_type": "product",
            "content_name": "Chocolate Peanut Butter",
            "price": 56.3,
            "quantity": 1
        }],
        "currency": "USD",
        "value": 56.3
    },
```


**Figure 10 (TikTok)**

125. In addition to disclosing consumer PII and product details to TikTok, Defendant also enabled the _ttp cookie. The _ttp cookie is an advertising cookie that, when implemented, "measure[s] and improve[s] the performance of advertising campaigns and personalize[s] the

customer['s] experience (including ads) on TikTok."[59]

126. Likewise, Defendant discloses its customers' PII (hashed email) and product details to Snap. Fig. 11. This information is associated with the sc_at cookie, a marketing cookie which Snap "use[s] to identify a visitor across multiple domains."[60]

| | |
|---|---|
| pid | 4043a900-607e-45d5-a47c-47e6254223f0 |
| ev | ADD_CART |
| intg | gtm |
| u_hed | 591bfe88c880df9685d3e298cac2271681a78e017441426ae3d5bd6c73cd3db7 |
| u_hem | 418c50423bf8e8660509fa7eb50e24886a60d035ffea3f7e120816f4f2c3b0d0 |
| e_pr | 56.3 |
| e_iids | 4357631246447 |
| e_cur | USD |
| pids | 4043a900-607e-45d5-a47c-47e6254223f0 |
| e_ic | 919fad99-038c-4f05-914c-d66d8f5afc98 |
| e_ni | 1 |
| u_c1 | 9a2f2923-cccc-426c-933b-ce43febdbc8d |
| u_sclid | 9b1df224-f424-4549-a7ba-70da106855f1 |
| u_scsid | c7704e40-ed3a-465b-833e-52bb14ad3ae1 |
| gat | G-90HLWD65GK%2CAW-730236622%2CG-QXZ7B01E0E%2CGTM-TZ26D3N |
| bg | false |
| bt | 1d53c387 |
| d_a | x86 |
| d_bvs | %5B%2C%7B%22brand%22%3A%22Google%20Chrome%22%2C%22version%22%3A%22143.0.7499.170%22%7D%7B%22brand%22%3A%22Chromium%22%2C%22version%22%3A%22143.0.7499.170%22%7D%7B%22brand%22%3A%22Not%20A(Brand%22%2C%22version%22%3A%2224.0.0.0%22%7D%5D |
| d_os | 19.0.0 |
| d_ot | Windows |
| df | true |
| huah | true |
| m_dcl | 1870 |
| m_fcps | 1820 |
| m_pi | 1870 |
| m_pl | 10202 |
| m_pv | 2 |
| m_rd | 93492 |
| m_sh | 2560 |
| m_sl | 4406 |
| m_sw | 1440 |
| pl | https%3A%2F%2Fhuel.com%2Fproducts%2Fhuel-black-edition |
| rf | https%3A%2F%2Fcheckout.huel.com%2F |
| trackId | 6840e9c1-c5ea-4605-b411-200aeb9b4753 |
| ts | 1767996467809 |
| v | 3.54.0-2512101929 |

**Figure 11 (Snap)**

[59] *About using cookies with TikTok Pixel*, TIKTOK BUSINESS HELP CENTER, https://ads.tiktok.com/help/article/using-cookies-with-tiktok-pixel?lang=en.

[60] *Cookie Information*, SNAP INC., https://www.snap.com/privacy/cookie-information.

**J. Defendant Did Not Anonymize Consumer Data By Disclosing "Hashed" Values To Third Parties**

127. The Federal Trade Commission routinely evaluates privacy representations by companies. When it comes to hashing the FTC has said the following:

> Companies often claim and act as if data that lacks clearly identifying information is anonymous, but data is only anonymous when it can never be associated back to a person. If data can be used to uniquely identify or target a user, it can still cause that person harm.
>
> One way that companies obscure personal data is through "hashing." Hashing involves taking a piece of data—like an email address, a phone number, or a user ID—and using math to turn it into a number (called a hash) in a consistent way: the same input data will always create the same hash.
>
> . . .
>
> This logic is as old as it is flawed – hashes aren't "anonymous" and can still be used to identify users, and their misuse can lead to harm. Companies should not act or claim as if hashing personal information renders it anonymized. FTC staff will remain vigilant to ensure companies are following the law and take action when the privacy claims they make are deceptive.[61]

128. Thus, Defendant sent and Third Parties intercepted Plaintiff and Class Members personally identifiable information regardless of whether it was hashed or plain text.

**CLASS ALLEGATIONS**

129. **Class Definition:** Plaintiff brings this action individually and on behalf of various classes of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

> The **Nationwide Class** that Plaintiff seeks to represent is defined as: All individuals residing in the United States who made a purchase on the website, www.huel.com, during the Class Period.
>
> The **California Subclass** that Plaintiff seeks to represent is defined as: All individuals residing in California who made a purchase on the website, www.huel.com, during the Class Period.

[61] *No, hashing still doesn't make your data anonymous*, FEDERAL TRADE COMMISSION (Jul. 24, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/07/no-hashing-still-doesnt-make-your-data-anonymous.

130. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

131. The Nationwide Class and California Subclass are referred to collectively as the "Classes."

132. Excluded from the proposed Classes are Defendant; any affiliate, parent, or subsidiary of Defendant, any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant, any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

133. Plaintiff reserves the right to amend the definitions of the Class or Subclass and add subclasses if further information and discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

134. **<u>Numerosity</u>:** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time. However, it is estimated that there are at least thousands of individuals in the Classes. The identity of such membership is readily ascertainable from Defendant's records and third-parties Meta, TikTok, and Snap's records.

135. **<u>Existence and Predominance of Common Questions of Fact and Law</u>:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Classes. The questions of law and fact common to the proposed Classes predominate over questions affecting only individual class members. Such questions include, but are not limited to, the following:

a. Whether Defendant's acts and practices violated the ECPA.

b. Whether Defendant's acts and practices violated CIPA § 631;

c. Whether Defendant's acts and practices violated CIPA § 632;

d. Whether Defendant's acts and practices violated CDAFA § 502, *et seq.*;

e. Whether Defendant's acts and practices violated the privacy rights of Plaintiff and

members of the California Class under the California Constitution; and

f. Whether Plaintiff and members of the proposed Classes are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

136. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because the Plaintiff, like all other class members, visited the Website and had her confidential electronic communications intercepted and disclosed to Third Parties.

137. **Adequacy:** Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the Classes she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiff and her counsel.

138. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Classes. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Finally, Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Classes as a whole.

//

//

//

//

## CAUSES OF ACTION

### COUNT I
**Violation Of The Electronic Communication Privacy Act,**
**18 U.S.C. § 2511, *et seq.***
**(On Behalf of the Nationwide Class)**

139. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

140. Plaintiff brings this claim on behalf of herself and members of the Nationwide Class.

141. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

142. The ECPA protects both the sending and the receipt of communications.

143. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

144. The transmission of Plaintiff's sensitive and personal information to Defendant's website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

145. The transmission of PII between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

146. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

147. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

148. The ECPA defines "electronic, mechanical, or other device," as "any device . . .

which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

149. The following instruments constitute "devices" within the meaning of the ECPA:

a. The computer codes and programs Defendant and Meta used to track Plaintiff's and Class Members' communications while they were navigating the Website;

b. The computer codes and programs Defendant and TikTok used to track Plaintiff's and Class Members' communications while they were navigating the Website;

c. The computer codes and programs Defendant and Snap used to track Plaintiff's and Class Members' communications while they were navigating the Website;

d. Plaintiff's and Class Members' browsers;

e. Plaintiff's and Class Members' mobile devices;

f. Defendant's and Meta's web and ad servers;

g. Defendant's and TikTok's web and ad servers;

h. Defendant's and Snap's web and ad servers;

i. The plan that Defendant and Meta carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website;

j. The plan that Defendant and TikTok carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website; and

k. The plan that Defendant and Snap carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

150. Plaintiff's and Class Members' interactions with Defendant's website are electronic communications under the ECPA.

151. By utilizing and embedding the tracking technologies provided by Meta, TikTok, and Snap on the Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class

Members in violation of 18 U.S.C. § 2511(1)(a).

152. Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technologies provided by Meta, TikTok, and Snap on its Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and sensitive and personal information to Meta, TikTok, and Snap.

153. The Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding their PII, including their identities and information related to their purchase on the Website. This confidential information is then monetized for targeted advertising purposes, among other things.

154. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to Meta, TikTok, and Snap through the Tracking Technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

155. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

156. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy and associating the content of Plaintiff's and Class members' electronic communications with preexisting consumer profiles and using the contents of their electronic communications in a manner that exceeds what Defendant promised Plaintiff and Class members on its Website.

157. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

158. As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may award statutory damages to Plaintiff and Class Members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably earned.

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf of the California Subclass)**

159. Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

160. Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

161. The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630–638. CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

162. A person violates California Penal Code § 631(a), if:

> By means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

163. Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires

with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

164. To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

165. At all relevant times, Defendant aided, agreed with, and conspired with the Third Parties to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website. These communications were intercepted without the authorization and consent of Plaintiff and Class Members.

166. Defendant, when aiding and assisting the Third Parties' wiretapping and eavesdropping, intended to help the Meta, TikTok, and Snap learn some meaning of the content in the URLs and the content the visitor requested.

167. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Technologies fall under the broad catch-all category of "any other manner":

a. The computer codes and programs the Third Parties used to track Plaintiff and Class Members' communications while they were navigating www.huel.com;

b. Plaintiff's and Class Members' browsers;

c. Plaintiff's and Class Members' computing and mobile devices;

d. Meta's web and ad servers;

e. TikTok's web and ad servers;

f. Snap's web and ad servers;

g. The web and ad-servers from which the Third Parties tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.huel.com;

h. The computer codes and programs used by the Third Parties to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.huel.com; and

i. The plan the Third Parties carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to visit www.huel.com.

168. The information that Defendant transmitted using Tracking Technologies constituted sensitive and confidential personally identifiable information.

169. As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting the Third Parties to receive its customers' sensitive and confidential online communications through www.huel.com without their consent.

170. As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 per violation or three times the amount of actual damages. Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered or be threatened with, actual damages." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## COUNT III
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 632**
**(On Behalf of the California Subclass)**

171. Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

172. Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

173. Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication..

174. Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be

confined to the parties thereto[.]"

175. The data collected on Defendant's Website constitutes "confidential communications," as that term is used in Section 632, because class members had an objectively reasonable expectation of private with respect to their personally identifiable information.

176. Plaintiff and Class Members expected their communications to Defendant to be confined to Defendant in part, because of Defendant's consistent representations that these communications would remain confidential. Plaintiff and Class Members did not expect third parties, and specifically Meta, TikTok, and Snap, to secretly eavesdrop upon or record this information and their communications.

177. The Tracking Technologies from Third Parties, are all electronic amplifying or recording devices for purposes of § 632.

178. By contemporaneously intercepting and recording Plaintiff's and Class members' confidential communications to Defendant through this technology, the Third Parties eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

179. At no time did Plaintiff or Class members consent to Defendant or Third Parties conduct, nor could they reasonably expect that their communications to Defendant would be overheard or recorded by Third Parties.

180. The Third Parties utilized Plaintiff's and Class members' personally identifiable information for their own purposes, including advertising and analytics.

181. Defendant is liable for aiding and abetting violations of Section 632 by the Third Parties (i.e., Meta, TikTok, and Snap).

182. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Members of the California Subclass have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

**COUNT IV**
**Violation of the Comprehensive Computer Data and Access and Fraud Act**
**Cal. Penal Code § 502, *et seq.***
**(On Behalf of the California Subclass)**

183. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

184. Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

185. The California Comprehensive Computer Data Access and Fraud Act ("CDAFA") was enacted to provide protection from "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

186. CDAFA affords a private right of action to owners of computers, systems, networks, programs, and who suffer damage or loss as a result of a violation of the Act. *See* Cal. Penal Code § 502(e)(1).

187. Relevant here, Cal. Penal Code § 502 imposes civil liability on anyone who:

> (c)(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;
>
> (c)(3) Knowingly and without permission uses or causes to be used computer services.
>
> (c)(6) Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section.
>
> (c)(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.
>
> (c)(8) Knowingly introduces any computer contaminant into any computer, computer system, or computer network.

188. Under § 502 of the California Penal Code "[f]or purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Cal. Penal Code § 502(j).

189. "Computer services" under the CDAFA "includes, but is not limited to, computer time, data processing, or storage functions, internet services, electronic mail services, electronic

message services, or other uses of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(4).

190. "Computer network" is "any system that provides communications between one or more computer systems and input/output devices, including, but not limited to, display terminals, remote systems, mobile devices, and printers connected by telecommunication facilities." Cal. Penal Code § 502(b)(2).

191. "Computer system" is "a device or collection of devices, including support devices…one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

192. "Data" is defined as "a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions" that "may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

193. "Computer contaminant" is defined as "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent or permission of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, that are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consumer computer resources, modify, destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network." Cal. Penal Code § 502(b)(12).

194. Defendant's conduct, described herein, violates Cal. Penal Code §§ 502(c)(2), (3), (4), (6), (7), and (8).

195. Plaintiff and California Subclass members were the owners or lessees of the computers, computer systems, computer networks, and data described herein.

196. Defendant violated Cal. Penal Code § 502(c)(2) by knowingly accessing and without permission taking, copying, analyzing, and using Plaintiff's and the California Class members' data and

sharing it with Third Parties.

197. In violation of Cal. Penal Code § 502(c)(8), Defendant knowingly introduced and continues to introduce computer contaminants into Plaintiff's and the California Subclass members' computer, computer system, or computer network. Among other things, Defendant introduced Tracking Technologies from Meta, TikTok, and Snap. The Tracking Technologies are designed to, and do, self-propagate to contaminate users' computers, computer systems, and computer networks to record and transmit data that would not otherwise be transmitted or recorded in the normal operation of the computers, computer systems, and computer networks. These technologies usurp the normal operation of Plaintiff's and California Subclass's computing devices because they supplant Plaintiff's and California Subclass' choices in how those devices and their resources are used.

198. In violation of §§ 502(c)(2)-(3), (6)-(8), Defendant knowingly took, copied, accessed, used, caused to be used, altered, and added Plaintiff's and California Subclass' data, computers, computer services, and computer networks. Among other things, Defendant knowingly introduced its technologies into Plaintiff's and California Subclass' computers, computer systems, and computer networks and provided itself and other entities the means of accessing Plaintiff's and California Subclass' computers, computer systems, and computer networks in violation of CDAFA by developing the technologies and encouraging and providing the means for websites and other online services to use and deploy them on their platforms.

199. Defendant makes use of Plaintiff's and California Subclass members' valuable data to obtain money through advertising

200. Defendant's use of Plaintiff's and California Subclass members' data is wrongful and unlawful, as described herein

201. Plaintiff and Class Members suffered economic injury because Defendant caused numerous third parties—including Meta, TikTok, and Snap—to unjustly profit from Plaintiff and Class Members personal information and online activity.

202. It would not be equitable to allow those third parties to keep those profits, which were generated by Defendant's violations of Plaintiff and Subclass member's privacy interests.

203. As a direct and proximate result of Defendant's unlawful conduct within the meaning of Cal. Penal Code § 502, Defendant has caused loss to Plaintiff and the California Subclass members in an amount to be proven at trial.

204. Plaintiff, on behalf of herself and the California Subclass, seeks compensatory damages and/or disgorgement in an amount to be proven at trial, and declaratory, injunctive, or other equitable relief.

205. Plaintiff and members of the California Subclass are entitled to punitive damages because Defendant's violations were willful, and, upon information and belief, Defendant is guilty of oppression, fraud, or malice within the meaning of Cal. Civil Code § 3294 such that Plaintiff and Class Members are entitled to recovery of exemplary damages under Cal. Penal Code § 502(e)(4).

206. Plaintiff and Class Members are also entitled to recover reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

## COUNT V
## Invasion of Privacy Under California's Constitution
## (On Behalf of the California Subclass)

207. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

208. Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

209. Plaintiff and Class Members have an interest in: (1) precluding the dissemination of their sensitive, confidential online communications; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

210. At all relevant times, by using the Tracking Technologies to record and communicate their sensitive and confidential online communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

211. Plaintiff and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, and other data would remain confidential and that Defendant would not install wiretaps on www.huel.com.

212. Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' sensitive confidential online communications.

213. The invasion of privacy was serious in nature, scope, and impact because it related to their sensitive and private online communications. Moreover, it constituted an egregious breach of societal norms underlying the privacy right because Defendant promised to keep Plaintiff and Members of the California Subclass's communications confidential.

214. Accordingly, Plaintiff and members of the California Subclass seek all relief available for invasion of privacy claims under California's Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order certifying the putative Nationwide Class and California Subclass defined above, naming Plaintiff as the representative of the putative Classes, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class and Subclass Members;

(b) For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the putative Classes on all counts asserted herein;

(d) For statutory damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For injunctive relief as pleaded or as the Court may deem proper; and

(g) For an order awarding Plaintiff and the putative Classes their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury for any and all issues in this action so triable of right.

Dated: May 22, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Sarah N. Westcot*
Sarah N. Westcot

Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave, Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
E-mail: swestcot@bursor.com

*Counsel for Plaintiff*