United States District Court
Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

EDEN MCKIE,
Plaintiff,

v.

HUEL LTD.,
Defendant.

Case No. 26-cv-00653-CRB

**ORDER GRANTING MOTION TO DISMISS**

Plaintiff's case concerns the legality of online cookies[1] that track users' website browsing. Plaintiff Eden McKie ("McKie") browsed Defendant Huel Ltd.'s ("Huel") online food and grocery retail store website. On the website, she opted out of third-party cookie tracking through a pop-up consent banner. Yet the website continued to track her interactions on the site, including the pages she visited and the food items she purchased. McKie brings suit against Huel for allowing third parties to install cookie software that intercepted and disclosed her personal information—despite her express decision to opt out of such data collection. McKie brings five claims alleging both federal and California state privacy violations. Because McKie fails to allege that the limited tracking of non-sensitive data constitutes a concrete harm outside of a statutory violation, she does not satisfy the requirements for Article III standing. Accordingly, the Court **GRANTS** the motion to dismiss all claims, with leave to amend.

[1] An online cookie is a small text file sent between a device and a server that stores data about the device when a user visits a specific website.

## I. BACKGROUND

McKie is a resident of Fremont, California. First Amended Complaint ("FAC") (dkt. 17) ¶ 7. Huel, a UK-based company, runs a large, online retail site for food and ingredient delivery. Id. ¶ 2. McKie alleges that while in California "on or around" June 11, 2025, she "accessed and navigated" www.huel.com (the "Website"). Id. at 1. Upon accessing the site, McKie viewed a pop-up cookie consent banner and "expressly rejected such tracking." Id. ¶¶ 8, 20–22. The banner included options for users to click "Accept" or "Required cookies only"—and additionally, users could go to a "Cookie Settings" link to personalize the settings by switching off specific cookies, such as "performance cookies," "functional cookies," and "targeting cookies." Id. ¶¶ 20–22.

After McKie rejected tracking cookies,[2] she proceeded to browse different pages on the Website "to purchase four hot & savory meal packs and seven hot & savory meal cups." Id. ¶¶ 8, 118. Upon checkout, the Website prompted McKie to enter her "email address, phone number, name, and address." Id. ¶ 120.

McKie alleges that "irrespective of whether a consumer accepts or rejects cookies," Huel allowed embedded third-party cookies from Meta Platforms, Inc. ("Meta"), TikTok Ltd. ("TikTok"), and Snap Inc. ("Snapchat") to continue to run and "intercept" her communications on the Website. Id. ¶¶ 24, 27, 83, 93, 96. McKie alleges that these third-party companies each deploy powerful Pixel software tools, which install snippets of code on different host companies' websites to track users' activity. Id. ¶¶ 51, 58–59. These tools track users' activity and then disclose that data to both Huel and the owner of the Pixel tool. Id. McKie alleges that the information these tools collect allow Meta, TikTok,

[2] Although the FAC lays out the various options that "customers" may click on to personalize which cookies to enable, McKie never explains how she configured her settings. FAC ¶¶ 20–24. The complaint only alleges that McKie "rejected tracking"—but that is not a button provided on the pop-up cookie banner, at least the one that McKie documented in screenshots in her complaint. Did McKie click "required cookies only" or did she further personalize by switching off specific cookies, such as "performance cookies," "functional cookies," and "targeting cookies"? See id. ¶¶ 20–21.

Snapchat, and the company that hosts the websites that use their tools to "deliver more effective targeted advertisements." Id. ¶ 87.

McKie alleges that while she was browsing Huel's Website, cookies tracked and transmitted her identifying information—such as her IP address, device identifiers, name, address, email, and phone number, as well as content-specific information about her interactions on the Website, such as data relating to which page title or link she viewed and what products she purchased—all without her consent. Id. ¶¶ 8, 70, 83. McKie alleges that this tracking occurred only when she was on the Website. Id. ¶¶ 149, 165, 167. McKie also actively maintains accounts with Meta, TikTok, and Snapchat, and, as part of creating her accounts, she provided these companies with her full name, date of birth, phone number, and email address. Id. ¶ 7.

McKie brings a putative class action on behalf of users who visited the Website, including a subclass of nationwide users and another subclass of California users. Id. ¶¶ 129–30. There are five causes of action: (1) violation of the Electronic Communications Privacy Act ("ECPA"); (2) violation of Section 631 of the California Invasion of Privacy Act ("CIPA"); (3) violation of Section 632 of CIPA; (4) violation of the Comprehensive Computer Data and Access and Fraud Act ("CDAFA"); and (5) Invasion of Privacy under the California Constitution. Id. ¶¶ 161, 173, 185, 209.

Huel moves to dismiss all claims for lack of Article III standing and for failure to state a claim. Mot. (dkt. 22) at 5–6; Reply (dkt. 24) at 3–4.

## II. LEGAL STANDARD

Dismissal is appropriate under Rule 12(b)(1) of the Federal Rules of Civil Procedure when a court lacks subject matter jurisdiction due to a plaintiff's lack of Article III standing. White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000); see Maya v. Centex Corp., 658 F.3d 1060, 1067 (9th Cir. 2011). A 12(b)(1) challenge may be either facial or factual. White, 227 F.3d at 1242. In a facial attack, the jurisdictional challenge is confined to the allegations pleaded in the complaint, and the challenger asserts that "the allegations contained in a complaint are insufficient on their face to invoke federal



United States District Court
Northern District of California

jurisdiction." Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). To resolve a facial attack, the court assumes the allegations in the complaint are true and draws all reasonable inferences in favor of the party opposing dismissal. Wolfe v. Strankman, 392 F.3d 358, 362 (9th Cir. 2004). "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." Safe Air, 373 F.3d at 1039. "The party asserting [ ] subject matter jurisdiction bears the burden of proving its existence." Chandler v. State Farm Mut. Auto. Ins. Co., 598 F.3d 1115, 1122 (9th Cir. 2010).

## III. DISCUSSION

Huel argues both that McKie lacks standing for each of her claims and that she fails to state a claim for each of them. Mot. This Court does not reach a conclusion as to failure to state a claim because lack of standing—the first inquiry the Court must address pertaining to its jurisdictional authority—requires the Court to dismiss McKie's claims. See Lutge v. Timex.com, Inc., No. 26-cv-00960-EMC, 2026 WL 2691100, at *3 (N.D. Cal. Sep. 14, 2026) (dismissing all privacy-related claims in the complaint because they lacked Article III standing).

Huel argues that McKie lacks standing because she failed to identify a concrete privacy injury caused by the Website tracking her online browsing activities. Reply at 3. To establish standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016). The plaintiff bears the burden to demonstrate these elements. TransUnion LLC v. Ramirez, 594 U.S. 413, 430–31(2021). The parties here only dispute the first element.

For the first element, an injury-of-fact must be "concrete and particularized," meaning that it must be "a real controversy with real impact on real persons." Id. at 421, 424. A statutory violation alone, therefore, does not automatically satisfy standing. Id. at 414 (citing Spokeo, 578 U.S. at 340). Instead, the plaintiff's alleged harm must have "a close relationship to a harm traditionally recognized as providing a basis for a lawsuit in



United States District Court
Northern District of California

American courts." TransUnion, 594 U.S. at 414–15 (internal quotations omitted). Courts have held that a reliable guide to satisfy standing is for plaintiffs to "identify [in their pleadings] a close historical or common-law analogue" for their asserted harm. Id. Because standing requires "concrete and particularized" harm, courts have dismissed claims in cases like this alleging harms that are theoretical or potential. Mitchener v. CuriosityStream, Inc., 815 F. Supp. 3d 845, 850–51 (N.D. Cal. 2025) (dismissing the plaintiff's claims that describe generic software features without alleging particularized facts concerning the plaintiff). McKie details many potential harms caused by Meta, TikTok, and Snapchat's tracking software based on generic descriptions of these tools. FAC ¶¶ 52–109. While only naming "McKie" twice in the complaint, Plaintiff consistently makes allegations about how Huel and third-party companies interact with a hypothetical "consumer," "customer," or "individual," outside of any specific relationship to McKie and her single interaction with the Website. See id. ¶¶ 3–156 (describing a hypothetical "consumer" sixty-seven times throughout the complaint)[3]; see also In re Blue Shield of Cal. Priv. Litig., 840 F. Supp. 3d 841, 848 (N.D. Cal. 2026) (internal quotations omitted) ("Aside from alleging that tools are capable of collecting personal data, a plaintiff must allege those tools actually collected his data to establish standing."). By focusing on how third-party software features potentially track other customers, McKie has not alleged enough particularized facts about her interactions with the Website and her harms.

Since TransUnion, courts have focused on four discrete torts that parallel related

[3] McKie included a redlined version of her FAC, showing areas where she added a few specific details about Huel into the original complaint. Still, McKie's FAC largely focuses on the third-party companies, such as Meta, TikTok, and Snapchat. FAC ¶¶ 52–84 (discussing Meta software); id. ¶¶ 85–96 (discussing TikTok software); id. ¶¶ 97–109 (discussing Snapchat software). The lack of "concrete and particularized" details about McKie and Huel makes it difficult to decipher what actions the complaint alleges that McKie took on the Website and what data she is worried that Huel has disclosed to third parties. For example, in her complaint, McKie alleges: "Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the 'characteristics' of individual's communications with its Website (their IP addresses, Facebook ID, User-IDs, cookie identifiers, device identifiers, emails, and phone numbers) and the 'content' of these communications (the buttons, links, pages, and tabs they click and view related to the shopping and products sought from Defendant)." Id. ¶ 70 (emphasis added). It is unclear whether McKie alleges that her browsing of Huel's Website on Jane 11, 2025 triggered all of the above-mentioned tracking.

United States District Court
Northern District of California

privacy harms. See Popa v. Microsoft Corp., 153 F.4th 784, 787, 792 (9th Cir. 2025) (stating that there are "no free-roaming privacy right at common law but rather four discrete torts that protected specific kinds of privacy-related harms").[4] For privacy cases such as this one, the two analog common-law tort claims are "public disclosure of private facts" and "intrusion upon seclusion." Restatement (Second) of Torts § 652D; Restatement (Second) of Torts § 652B (1977) (including, as an example of Section 652B, tapping telephone wires); see Popa, 153 F.4th at 791 (holding that these two tort harms were the closest analogs to the plaintiff's harm caused by the collection of her private information from online tracking software). Courts analyze these two torts together because both hinge on whether the plaintiff adequately pleads that (A) the defendant intruded on the plaintiff's "expectation of privacy" and (B) this intrusion is "highly offensive to a reasonable person." In re Facebook, Inc. Internet Tracking Litig., 956 F.3d 589, 601 (9th Cir. 2020); see also Torres v. Seatgeek, Inc., No. 25-cv-07118-LB, 2026 WL 1495202, at *3 (N.D. Cal. May 21, 2026) (internal quotations omitted) (holding that "in the privacy context, the plaintiff must allege a reasonable expectation of privacy in the information collected and harm that is similar to the highly offensive interferences or disclosures that were actionable at common law").

Although McKie brings claims under four different statutes—ECPA, CIPA, CDAFA, and Invasion of Privacy—all stem from the same conduct and injury: that Huel tracked her activity on its Website, causing the disclosure of her private information to third parties. To assess the concreteness of this injury, the Court considers its relationship to the analog common-law tort claims discussed above whose elements are (A) whether McKie had an "expectation of privacy" and (B) whether third-party tracking on the

[4] In Black v. IEC Grp. Inc., the Ninth Circuit recently found that plaintiffs had Article III standing for claims against a health insurance website for failing to protect against the disclosure their sensitive medical records, including disclosure of healthcare insurance claims, because the injury resembled an analogous "breach of confidence" tort. No. 25-5952, 2026 U.S. App. LEXIS 30906, at *8–10 (9th Cir. Oct. 9, 2026). This is one example about how the list of analog common-law torts may expand in the future.

Website was "highly offensive to a reasonable person."[5]

A. **Expectation of privacy**

Internet users' expectation of privacy differs on a website-by-website basis. By default, "[i]nternet users have no expectation of privacy in . . . the IP addresses of the websites they visit." United States v. Forrester, 512 F.3d 500, 510 (9th Cir. 2008). Since the enactment of the California Consumer Privacy Act (CCPA), however, California internet users have come to expect the ability to adjust cookie tracking settings when they visit a website. See Wiley v. Universal Music Group, 826 F. Supp. 3d 1121, 1132–33 (N.D. Cal. 2026). The CCPA, therefore, has shifted the "customs, practices, and circumstances" of California website users towards a higher expectation of customized privacy online. Id. at 1132.

McKie alleges a plausible expectation of privacy due to the Website's assurance that she would not be tracked while she browsed. When McKie visited www.huel.com, she "expressly rejected [] tracking" by disabling cookies through a pop-up cookie consent banner that prompted her to click "Accept" or "Required Cookies Only." FAC ¶¶ 21, 27.[6] Huel represented to users that by opting out of specific cookies, their data would be anonymized. Id. ¶ 22. Despite McKie's express rejection, she alleges that third party cookies continued to track her interactions on the Website. Id. ¶ 24. McKie argues that

---

[5] See, e.g., Lutge, 2026 WL 2691100, at *1, *3 (assessing the plaintiff's ECPA, CIPA, and California Constitution Invasion of Privacy claims for a lack of a concrete harm based on the two-pronged tort harm: (1) whether the plaintiff had an "expectation of privacy" and (2) whether the defendant's conduct was "highly offensive"); In re Facebook, 956 F.3d at 601 (assessing the plaintiff's Invasion of Privacy, ECPA, and CIPA claims based on the same two-pronged, tort harm). Physical harm or economic loss satisfy the injury in fact requirement. Intangible harms, like violation of privacy, can too if they are analogous to one of the common-law tort harms noted above. For CDAFA claims, however, the statutory standing requires individuals to have suffered actual damage or economic losses. Cal. Penal Code § 502(e)(1); Cottle v. Plaid Inc., 536 F. Supp. 3d 461, 487–88 (N.D. Cal. 2021). This demonstrated loss must be distinct from the "profit Defendant made as a result of disclosing Plaintiffs' data." Shah v. Capital One Fin. Corp., 768 F. Supp. 3d 1033, 1048 (N.D. Cal. 2025). Therefore, McKie's CDAFA claims fail statutory standing because she does not allege any economic loss from the third-party cookie tracking. See, e.g., Torres, 2026 WL 1495202, at *7 (holding that CDAFA's statutory standing requires economic loss, which online tracking does not engender, in addition to the Article III standing requirements).

[6] Again, McKie never explicitly alleges what buttons she clicked or if this banner appeared during her visit.

United States District Court
Northern District of California

Huel, by offering an opt-out cookie setting, "induced Plaintiff's reasonable expectation of privacy by warranting [that] tracking was done anonymously." Opp'n (dkt. 23) at 1. Other courts support this rationale. In Ortiz v. Foris Dax, Inc. (Ortiz I), a website offering visitors an opt-out setting for cookies by clicking "Accept All," "Disable All," or "Customize Settings" continued tracking regardless of what setting visitors chose. No. 25-cv-08950-EMC, 2026 WL 1430720, at *1 (N.D. Cal. May 21, 2026). The court held that the opt-out setting was an "affirmative representation" sufficient for the plaintiff to expect privacy on a website that a visitor would have otherwise had no privacy expectation. Id. at 3. As in Ortiz I, the pop-up cookie banner on Huel's Website was an "affirmative representation" that McKie's data was anonymized. See FAC ¶ 24.

Huel argues that regardless of whether the Website misrepresented users' ability to adjust cookie settings, McKie would not have expected privacy because she had already voluntarily disclosed some of the same data to the same third-party companies (Meta, TikTok, and Snapchat) when she set up accounts with them. Mot. at 12 n.2; Reply at 1. McKie describes how during the online checkout for her food purchase, the Website "prompted [her] to enter [her] email address, phone number, and address," which Meta, TikTok, and Snapchat then "intercepted" through installed cookies. FAC ¶¶ 84, 93, 96, 109, 120, 124. McKie acknowledges providing her "full name, date of birth, phone number, and email address" to all three companies when she created accounts with them. Id. ¶ 7. But McKie's contact information and address could have changed since she set up her Meta, TikTok, and Snapchat accounts, and her disclosure of this information at one time does not remove her expectation of privacy indefinitely and on all websites. Additionally, other information that makes up the basis of McKie's privacy claims, such as her purchase history and website interactions, is not information that McKie previously disclosed to Meta, TikTok, or Snapchat. Therefore, the Court still presumes that McKie had an expectation of privacy when the Website allowed her to opt out of data tracking.

### B. Highly Offensive to a Reasonable Person

To evaluate whether cookie tracking resembles the analogous common-law torts of

United States District Court
Northern District of California

either public disclosure of private facts or intrusion upon seclusion, courts must also assess whether an intrusion is "highly offensive to a reasonable person." In re Facebook, 956 F.3d at 601. To make such an assessment, this Court considers both (1) the Website's misrepresentation of tracking and (2) the sensitive nature and breadth of the data it collected.

**1. Misrepresentation Factor**

McKie argues that the Website's misrepresentation of how it tracks users should fulfill all of the remaining requirements necessary for standing. Opp'n at 3–4. McKie suggests that the Court follow In re Facebook, where Facebook similarly set an expectation with its users that "data would not be collected, but then collected it anyway." Opp'n at 4 (citing 956 F.3d at 602). The Ninth Circuit held that such allegations constituted harm sufficient for Article III standing. In re Facebook, 956 F.3d at 602.

But In re Facebook predates Popa.[7] In Popa, the Ninth Circuit clarified how courts should assess standing for online privacy cases involving cookie tracking. Popa, 153 F.4th at 787, 794. Popa narrowed In re Facebook's applicability. Popa held that other factors relating to traditional tort privacy violations were necessary for standing, such as Facebook's extensive "cradle-to-grave" tracking beyond the company's website and its indiscriminate collection of data "no matter how sensitive." Id. at 794. The Ninth Circuit rejected a per se rule that any misrepresentation about cookies suffices for standing. Instead, it held that courts must assess "the individual circumstances giving rise to the plaintiffs' alleged injuries." Id.

In the wake of Popa, district courts in California have come to differing conclusions on how much weight to assign to a website's misrepresentation about tracking and whether

[7] Indeed, many of the cases that McKie cites for standing are pre-Popa. Opp'n at 2–4, 6 (citing In re Facebook, 956 F.3d 589; Eichenberger v. ESPN, Inc., 876 F.3d 979 (9th Cir. 2017); Gabrielli v. Motorola Mobility LLC, No. 24-cv-09533-JST, 2025 WL 1939957, at *6 (N.D. Cal. July 14, 2025) (pre-Popa case holding that the misrepresentation by a website that allowed users to reject cookies but still used them "deprived plaintiff control of personal information regarding his digital activity and profile are sufficient to establish a concrete injury to his right to privacy and confer standing")).

such misrepresentation satisfies the "highly offensive" prong.

Some courts hold that such a misrepresentation is nearly dispositive of whether data tracking is highly offensive. See Shah v. MyFitnessPal, Inc., 824 F. Supp. 3d 906, 914 (N.D. Cal. 2026) (holding that a website continuing to share diet and fitness data after the plaintiff opted out of unnecessary cookies was the type of harm recognized as highly offensive, though the sensitive nature of the data was "also relevant"); Gabrielli v. Haleon US Inc., 815 F. Supp. 3d 852, 866–67 (N.D. Cal. 2025) (holding that a website that continued to enable cookies after a plaintiff expressly rejected them had Article III standing, but distinguishing Popa because the disclosed information was "more sensitive" as it collected search terms, healthcare and payment information, personal interest, and real-time geolocation data in addition to personal identification data).

Other courts have concluded that a website's misrepresentation or deceit about tracking its users is just one factor of many in determining whether an invasion of privacy was "highly offensive." In In re Google Location History Litigation, the court held that "deceit" is a "plus factor" that can make a privacy intrusion "especially offensive" if other factors also weigh in that direction, such as continuous tracking when users leave the website. 514 F. Supp. 3d 1147, 1157 (N.D. Cal. 2021) (internal quotations omitted). "However, deceit alone does not convert every instance of routine information collection into a 'highly offensive' invasion." Lutge, 2026 WL 2691100, at *3; see, e.g., Garcia v. Blackhawk Network, Inc., No. 2:25-cv-07550-JLS-SSC, 2026 WL 925028, at *2, *5 (C.D. Cal. Apr. 1, 2026) (granting a motion to dismiss for lack of standing because the third-party collection of data was limited in scope to the defendant's website even though the plaintiff selected the "Required only" cookie option and tracking continued); Ortiz v. Foris Dax, Inc. (Ortiz II), No. 25-cv-08950-EMC, 2026 WL 3002660, at *4 (N.D. Cal. Oct. 6, 2026) (dismissing the plaintiff's claim for lack for standing because the data collected was not of a sensitive nature, even though the defendant's website kept cookies enabled after the plaintiff clicked "Disable All" on the pop-up consent cookie banner).

This Court is persuaded by the growing body of case law that rejects

misrepresentation of tracking as dispositive of a highly offensive privacy intrusion. Popa instructs courts to assess how the "individual circumstances" of an injury relate to traditional privacy torts. Popa, 153 F.4th at 792. Although Ortiz II held that the plaintiff had a "reasonable expectation of privacy" because a crypto-currency website continued to track him after he opted out of cookies, the court still held that this misrepresentation was not enough to constitute a "highly offensive" disclosure. 2026 WL 3002660, at *2, *4. Instead, other factors, such as the non-sensitive nature of the financial information that the plaintiff had searched on the website, outweighed the misrepresentation, and the court dismissed the case based on standing. See Ortiz II, 2026 WL 3002660, at *3–4. In Lutge, another case paralleling McKie's circumstances, the plaintiff "rejected cookie tracking" on an opt-out cookie consent banner, where the website represented that it would "not hand over your personal information to a third party," and yet the website continued to use cookies to track the plaintiff as he shopped online for a watch. 2026 WL 2691100, at *2. The court held that because the disclosure of the data concerned non-sensitive information about which watch the plaintiff purchased, the misrepresentation alone could not satisfy the requirement of a concrete harm. Id. at 3–4.

Because misrepresentation is only one factor for whether Huel's intrusion into McKie's privacy was "highly offensive," the Court must assess other factors.

**2. Sensitive Nature and Breadth of Data Collected Factors**

Courts assess whether an intrusion is "highly offensive" by examining two other factors: (a) whether the information the defendant disclosed was of a "sensitive" nature, and (b) the extent of data collected from the plaintiff. See Garcia, 2026 WL 925028, at *5. In short, these factors concern the depth and breadth of tracking.

**a. The Sensitive Nature of the Data**

The sensitive nature of the data is the first "key" factor as to whether the intrusion is "highly offensive." Lutge, 2026 WL 2691100, at *3. Courts determine sensitivity categorically, typically finding tracking software "offensive" when it involves "medical or financial information." Popa, 153 F.4th at 791. In Malko v. GNC Holdings, LLC, for

example, the court held that data involving wellness products, such as dietary supplements and vitamins for pre-workouts, did not rise to the level of sensitive information. No. 2:26-cv-01833-MCS-AJR, 2026 WL 2218133, at *3–4 (C.D. Cal. July 29, 2026); see also Maghoney v. Dotdash Meredith, Inc., No. 24-cv-2394-AJB-BJW, 2026 WL 497402, at *5 (N.D. Cal. Feb. 23, 2026) (holding that data collected from the plaintiff that "merely search[ed] sensitive related terms" on a publicly accessible website did not constitute sensitive data for Article III standing because the website "is not a patient portal" where searches are "tied to [the plaintiff's] personal medical history"). By contrast, data that reveals a website user's health status and treatment is sensitive. See Semien v. PubMatic Inc., No. 25-cv-03164-SI, 2026 WL 216333, at *4–5 (N.D. Cal. Jan. 27, 2026) (determining that there was standing where the defendant tracked full-string URLs of each website page the plaintiff browsed to collect "sensitive information like health status and treatment, travel plans, political affiliation, sexual orientation, and more").

Here, the data that Huel allegedly tracked does not rise to the requisite level of sensitivity. McKie alleges that the third-party cookies tracked and transmitted her identifying information (name, location) and her contact information (email and phone number).[8] FAC ¶¶ 118–20. Additionally, the cookies collected data relating to which page title she viewed and what products she purchased on the Website ("four hot & savory meal packs and seven hot & savory meal cups"). Id. ¶¶ 8, 83. Huel argues that this information is "basic" and "non-private," and that "Article III requires more." Mot. at 5–6 Huel also asserts that McKie does not allege that "anyone obtained her private correspondence, financial account information, search terms, messages, or other sensitive communications." Id.

As this Court has held, disclosure of medical data—and not what groceries one

---

[8] McKie alleges that Meta generally has the capability to "receive[] an abundance of consumer information, including hashed email (i.e., PII), payment event details, and item details, which it associates with various identifiers, even when the purchaser rejects all cookies." FAC ¶ 120. But McKie never alleges that the cookies on the Website that use Meta Pixel have recorded any of her payment information.

buys—provokes greater privacy concerns in CIPA cases because of that information's sensitive nature. Rusow v. Skinspirit Essential LLC, No. 24-cv-09317-CRB, 2025 WL 4657637, at *9 (N.D. Cal. Oct. 15, 2025) (holding "general disclosure of a user's information can perhaps reasonably extend to what video games he plays or what groceries he buys, but not to his private health information"). The type of data collected here is analogous to groceries, or to the data at issue in Popa. In Popa, the defendant tracked the plaintiff without consent on its pet-supply website, collecting information on the plaintiff's "pet-store preferences" based on what products the plaintiff clicked on with her mouse and how far down the webpage she scrolled. Popa, 153 F.4th at 786–87, 791. The Ninth Circuit held that the disclosure of this type of information was not sensitive enough to give a plaintiff standing. Id. ("[T]he monitoring of Popa's interactions with [defendant's pet-store] website seems most similar to a store clerk's observing shoppers in order to identify aisles that are particularly popular or to spot problems that disrupt potential sales."). As in Popa, the retail-related data that Huel collected on its Website is equivalent to what Huel could monitor if McKie had stepped into a public, brick-and-mortar store. McKie's food purchase does not reveal the type of "embarrassing, invasive, or otherwise private information" necessary to constitute a harm at common law. See Popa, 153 F.4th at 791.

**b. The Breadth of Data Collected**

The extent of the third-party cookies' collection of McKie's information is the second factor as to whether the intrusion McKie suffered is "highly offensive." See Garcia, 2026 WL 925028, at *5 ("Second, the scope of the collection may be so broad, for example by tracking a Plaintiff's activity across other websites, that it renders the tracking highly offensive."). McKie, however, alleges a limited breadth of data collection. Post-Popa, a narrow application of In re Facebook remains, namely, that data tracking can be "highly offensive" when that tracking is extensive across websites and comprehensive of a user's profile. In re Facebook, 956 F.3d at 598–99. The court in In re Facebook held that Facebook's tracking of its users—"including what they did when they were not using Facebook"—and then its amassing "a great degree of personalized information" to create

"cradle-to-grave profile[s]" constituted a concrete harm adequate for standing. Id.

McKie's allegations fall short of this benchmark. McKie alleges that she navigated to www.heul.com on or around June 11, 2025. FAC ¶ 8. All of McKie's allegations about the scope of the data collection are limited to interactions on that Website. Id. ¶¶ 149, 165, 167 (alleging tracking began "while they were navigating the Website," "while accessing the Website," and "while they were using a browser to visit www.huel.com"). All occurred on a single occasion. Id. ¶ 83.[9] McKie's allegations about one-time data collection on the Website distinguishes the case from this Court's holding in Mirmalek v. Los Angeles Times Communications LLC, which pre-dated Popa and held that the plaintiff had standing because the defendant used a pen register to track a user's website activity "over time" and "across multiple visits." No. 24-cv-01797-CRB, 2024 WL 5102709, at *4 (N.D. Cal. Dec. 12, 2024); see also Wooten v. BioLife Plasma Services L.P., 807 F. Supp. 3d 1139, 1144 (E.D. Cal. 2025) (dismissing for lack of standing because "one-time collection and dissemination of plaintiffs' IP and email addresses, through the third-party trackers" failed to establish extensive enough data collection for a concrete injury).

McKie's failure to allege that (1) her interactions on the Website were of a sensitive nature and (2) third parties collected her data beyond the confines of the Website and beyond a single visit, therefore, outweighs her successful pleading of an expectation of privacy. Because McKie has failed adequately to allege that Huel allowed "highly offensive" tracking on its Website necessary to constitute a concrete privacy injury, her claims lack standing and fail. See Ortiz II, 2026 WL 3002660, at 4 (dismissing all privacy-related claims in the complaint because the plaintiffs failed to establish Article III standing). Accordingly, the Court GRANTS the motion to dismiss with leave to amend.

---

[9] McKie also alleges, only once in her complaint, that Huel's use of third-party cookies introduced computer "contaminant[s]" into her computer system and network that are designed to "self-propagate" and transmit data from her computer's normal operations, akin to a computer virus or malware. FAC ¶ 197. These claims are unsupported and implausible.

United States District Court
Northern District of California

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS the motion to dismiss all claims with leave to amend within thirty days of this order if McKie can do so in good faith.

**IT IS SO ORDERED.**

Dated: October 26, 2026

CHARLES R. BREYER
United States District Judge